**Affirmed and Memorandum Opinion filed November 29, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00497-CV

## IN THE INTEREST OF N.W.L.T. AND J.A.C., CHILDREN

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-01224J**

## M E M O R A N D U M   O P I N I O N

Appellant K.N.L. ("Mother") appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her children N.W.L.T. ("Nancy") and J.A.C. ("Joyce").[1] The trial court terminated Mother's parental rights on predicate grounds of endangerment and failure to complete a family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), and (O) (West Supp. 2017). The trial court further found that

---

[1] Nancy and Joyce are pseudonyms. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

termination of Mother's rights was in the children's best interest. In five issues Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on the predicate grounds and that termination was in the child's best interest. Mother also challenges the trial court's finding that the Department should be named managing conservator of the children. Because we conclude the evidence is legally and factually sufficient to support the trial court's findings, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Proceedings

#### 1. Pretrial Removal Affidavit

The Department received a referral for the neglectful supervision of Mother's six-month-old child, C.F. ("Chris"), who died after co-sleeping with Mother. The referral noted that Mother admitted to drinking the night before the child was found dead.

The Department concluded that there was an immediate danger to the physical health and safety of the children who remained in the home, Nancy and Joyce, and that continuation in the home would be contrary to their welfare.

#### 2. The Investigation

The Department began the investigation by interviewing Nancy, who was thirteen years old. Nancy told the investigator that she had gone to sleep the night before at 11:24 p.m. with Mother, Joyce, and Chris on the couch. Mother fed Chris then laid him down on the couch to sleep. Nancy woke up around 6:00 a.m. and Mother called the police because Chris was not breathing. Nancy had no marks or bruises indicative of abuse and appeared to be developmentally on target.

The investigator next interviewed Joyce, who was four years old. Joyce could not identify the difference between the truth and a lie. Joyce explained that her brother

went to sleep, but when Joyce woke up he was dead and her mother was crying. Joyce had no marks or bruises indicative of abuse and appeared to be of appropriate height and weight for a child her age.

The investigator interviewed Mother, who appeared "tired, disheveled, and looked as if she had just finished weeping." Mother was not taking medication at the time, but from ages thirteen to sixteen, she took Zoloft to treat depression. Mother admitted she drank four sixteen-ounce cans of beer the night before Chris's death while watching television with her children and Chris's paternal grandmother. Mother maintained that she was not intoxicated. Mother told the investigator that they all went to sleep around 11:30 p.m. with Nancy and Joyce on one end of a sectional sofa while Mother and Chris slept at the other end. Mother slept next to Chris because he cried when she placed him in a crib. When Mother awoke she noticed that Chris was cold to the touch and not breathing. The paternal grandmother went to a neighbor's house and asked the neighbor to call 911. Mother administered CPR at the direction of the 911 operator. An autopsy was performed on Chris, and law enforcement investigated, but no charges were filed against Mother.

The investigator was unable to interview the paternal grandmother on that occasion because she was deaf, and the investigator did not know American Sign Language or any other language. The record does not reveal whether the paternal grandmother was interviewed.

The investigator spoke with the police officer who responded to the 911 dispatch the morning Chris died. The officer advised that charges would not be filed, if at all, until preliminary results from the Medical Examiner's office were received. The autopsy revealed no sign of trauma other than broken ribs caused by CPR. The Medical Examiner noted a hemorrhage behind the right side ear. The doctor noted that, "it is very possible that the subgaleal hemorrhage was caused by someone lying on top of

the baby[.]"

On the day of the investigation, Mother agreed to submit to a drug test. Three days later, the investigator arrived at Mother's home to take her to the drug testing facility. Mother did not respond to the investigator's text advising Mother she had arrived. After waiting fifteen minutes, the investigator knocked on the door, and Chris's father ("Colin") answered. Colin greeted the investigator by hugging her and saying he liked the way she smelled. Colin and Mother both smelled of alcohol and appeared intoxicated. Mother rode with the investigator to the drug-testing facility. Mother's drug test was positive for alcohol and negative for all other substances. After giving her sample, Mother wandered around outside looking for the investigator's car. Mother was called back in to the facility where she fell asleep in the lobby for approximately an hour. After Mother woke up, the investigator asked if Mother had been drinking that day, and Mother admitted drinking two 24-ounce beers before the investigator picked her up. The Department investigator asked Mother for names of potential placements for her children. Mother only wanted the children to be placed with her mother, but did not have contact information for her mother.

### 3. Mother's Department History

Approximately two years earlier, in 2015, the Department received a referral alleging neglectful supervision of Nancy and Joyce by Mother. The report alleged that Nancy was "unusually withdrawn and sorrowful at school." It was reported that Nancy went to school wearing pajamas and was trying to hide from other students. On a separate day, Nancy went to school with blood on her pants and undergarments and explained that her mother did not have time to go to the "laundry mat." Nancy was often sent to school smelling of urine, cigarette smoke, and body odor. Mother told school staff she was working at a night club. Mother was offered resources to help, but declined to fill out an application. After the Department conducted an investigation

4

the allegations were ruled out.

Later, in September 2015, the Department received another referral alleging neglectful supervision of Nancy. The affidavit reflects the following information from the referral:

> There were also allegations of sexual abuse of [Nancy] by an unknown perpetrator. [Nancy] allegedly did not have anyone to pick her up after school, [Nancy] had to be transported by law enforcement to a Child Protective Services office. Two months later [Mother] called the school and asked if [Nancy] was there because she had not come home the night before. [Mother] told school staff she thought [Nancy] was two months pregnant because she was sleeping with a family member. It was also reported a case was called in a couple of months ago and there were still the same concerns from the previous case. After conducting an investigation, it was determined [Nancy] was not pregnant and the allegations were ruled out.

### 4. Criminal History

Mother had no criminal history. Colin, Chris's father, and the man Mother was living with at the time Nancy and Joyce were removed, had an extensive criminal history, from 2005 through 2016. Colin had convictions for assault on a public servant, injury to a child, and two convictions for assault on a family member, in addition to several convictions for non-violent offenses.

### 5. Family Service Plan

Following removal, the trial court signed a temporary order appointing the Department as Nancy's and Joyce's temporary managing conservator and ordering Mother to comply with a family service plan. The order explained that Mother's failure to comply with the court's orders could result in restriction or termination of her parental rights.

The family service plan required Mother to:

5

- sign a release of information;

- remain in contact with the caseworker at least twice per month;

- secure housing that is stable for her and the children;

- refrain from any involvement in criminal activities;

- maintain employment in order to be able to provide food, clothing, and a safe, appropriate home environment for her and her children;

- participate in all scheduled court hearings, permanency team meetings and family group conferences;

- participate in random drug/alcohol testing at dates, times and locations determined by the Department;

- participate in visitation supervised by the Department;

- complete a substance abuse assessment at an approved provider given to her by the caseworker;[2] and

- participate in a psychosocial evaluation at an approved provider given to her by the caseworker.

## 6. Court-Appointed Advocate's Report

The court-appointed Child Advocate filed a report, which noted that Nancy and Joyce were placed with a full-time caregiver on February 28, 2017. They lived in a clean spacious home located in a safe neighborhood. The caregiver was appropriately meeting the children's needs and maintaining all scheduled appointments for the children. Nancy was making progress in summer school and with her therapist. The Child Advocate met with the children's therapist, who expressed concerns about the children returning to Mother. Joyce told the therapist that she had some beer while living with Mother and that Mother laughed and said, "It's okay." Joyce reported to the therapist that she drank beer several times while living with Mother.

---

[2] This part of the family service plan also stated "[i]f alcohol/drug treatment is recommended, [Mother] will understand that in order to successfully participate and apply skills learned in treatment, she must become and remain alcohol/drug free."

The Child Advocate report noted that several of Mother's drug tests from April 13, 2017 through January 10, 2018 were negative. Mother had positive drug test results for alcohol on March 23, 2017, July 18, 2017 and on October 26, 2017. On April 25, 2017, Mother was ordered to complete alcohol testing as well as hair follicle drug testing, but did not appear.

The Child Advocate made an unannounced visit to Mother's home on October 25, 2017. The Advocate knocked on the door for "almost ten minutes," and during this time "there was yelling and arguing from inside the apartment." An unknown male opened the door and Mother allowed the Advocate into the home. When Mother was asked the name of the man who opened the door, "[Mother] hesitated for several seconds and stated, 'Uhm, uhm, His name is Demetrius.'" Mother told the Advocate the man was her cousin, but the Advocate noted that he appeared to possibly be the father of the child Mother was pregnant with at the time, as well as Chris's father.

Mother completed a substance abuse assessment, which led to a diagnosis of "Alcohol Moderate Substance Use Disorder." The assessment recommendation was to undergo Intensive Outpatient Treatment, a psychosocial assessment, parenting skills training, and a monthly random urine analysis.

B.    Trial

Trial began with Mother's attorney offering an irrevocable affidavit of voluntary relinquishment of parental rights to the Department. Mother was not present at trial. The trial court questioned the attorneys about whether Mother had other children and any prior terminations. The court rejected Mother's affidavit of relinquishment and ordered trial resumed at a later date. At that time, Mother was living in Montgomery County with a two-month-old child, who was born while this case was pending.

When trial resumed Mother withdrew her affidavit of relinquishment. The trial

court admitted without objection birth certificates for both children, a copy of the removal affidavit, a copy of Mother's family service plan, the autopsy report on Chris, Mother's drug test results, the Child Advocate's report, and Colin's criminal records.

### 1. Mother

The caseworker testified to the events in the removal affidavit that caused the children to come into the Department's care. The day after Chris's death, February 25, 2017, the Department investigator arrived to find Mother "heavily intoxicated." The Department removed the children and created a family service plan for Mother. At a status hearing in April, Mother tested positively for alcohol.

Mother did not participate in any services between February and May. Two visits were scheduled for May, but Mother missed both visits. The caseworker testified that the children became so upset when Mother missed visits that the caseworker stopped telling the children about visits in advance. In July 2017 Mother moved to Montgomery County, and in August the caseworker learned that Mother was pregnant with another child. Although Mother completed a substance abuse assessment in August 2017, the caseworker tried to set up a second assessment because Mother tested positively for alcohol a third time in October after the first assessment. At least three of Mother's positive alcohol test results occurred while she was pregnant. Mother had not completed the portions of her family service plan that required her to follow recommendations of a substance abuse assessment.

The caseworker initially referred Mother to a substance abuse provider for an assessment, but Mother did not keep two appointments. The caseworker provided several options for providers to accommodate Mother's limited access to transportation and her move to Montgomery County. Mother, however, did not keep appointments with the providers. At the time of trial Mother had custody of her baby born in Montgomery County while this termination case was pending.

8

The Child Advocate coordinator testified, describing the encounter at Mother's house when the Advocate made an unannounced visit. The Advocate testified that after the visit she saw a picture of Colin, and identified him as the man who answered the door at Mother's home.

Mother previously failed to provide Nancy feminine hygiene products and sent her to school in soiled clothes. Child Advocates recommended termination of Mother's parental rights due to the infant's death, and Mother's continued positive alcohol test results while the termination case was pending and while pregnant. They further recommended termination because the children had bonded with their caregiver.

Mother testified that she completed all of her services except the substance abuse assessment. She said she was unable to complete the assessment because she moved to Montgomery County and did not have transportation to the assessment location. Mother admitted she tested positively for alcohol while the case was pending; she said it was because she drank red wine and "had low blood." Mother had a job and a place to live.

When asked about Colin's presence at Mother's home, Mother responded that he needed a place to stay but they were not "together," and, at the time of trial, they were not speaking. Mother testified that she missed visits with her children because she lacked transportation from Montgomery County to the visit location, which was at the Greenspoint Department office in Harris County. Mother's youngest child, a five-month-old infant, resided with her in Montgomery County. According to Mother's testimony, the Montgomery County Department tested her for drugs and alcohol, made "pop-up" visits to her home for ninety days, and "closed [her] case" on that child.

Mother admitted that she used alcohol as a "coping mechanism" when her children were initially removed, but asked that her rights not be terminated because she had been alcohol and drug free for approximately six months. On cross-examination

9

Mother was asked her response to the positive alcohol tests. Mother responded:

> I had confided in my caseworker and let her know that I had drank red wine because I had low blood and I had a blood transfusion when I had [C].[3] But when Montgomery County tested me down there in the hospital and my baby's blood, they said I did not have alcohol in my system.

Mother denied a relationship with Colin, who has a history of domestic violence, but admitted she was "cordial" with him and had "just been helping him out." Mother testified that Colin is Chris's father and is the father of the five-month-old baby who lives with her in Montgomery County.

## 2. The Children

At the time of trial Nancy was fourteen years old and Joyce was five. Mother had a bond with the children and was visiting them twice per month, but had failed to visit at the beginning of the termination case. The children also had a bond with their foster mother.

Both children were in therapy. Nancy was to be assessed for autism on the therapist's recommendation. Joyce had emotional needs that manifest whenever there is any type of instability in her life. Joyce was unable to find stability with Mother.

The children had a "great bond" with their foster mother and called her "Mom." They had made significant progress while living with their foster mother, who is willing to adopt both children and has access to programs that will assist her in caring for them. The Advocate testified it would be detrimental to the children to remove them from the foster mother.

After Mother testified, the Department rested. The court recessed for two weeks and instructed the Department to return with information showing what actions, if any,

---

[3] Mother named the infant who was living with her in Montgomery County.

10

the Department had taken with respect to the five-month-old living with Mother in Montgomery County.

When trial resumed the Department presented the trial court with two documents, one from Montgomery County and one from Harris County. The documents were not admitted into evidence or read into the record. After reading the documents, the trial court noted that the Department in Montgomery County had no knowledge of the termination case pending in Harris County. The children's attorney ad litem informed the court that there appeared to be "a disconnect between Harris County and Montgomery County," which he described as "bureaucratic inconsistencies."

The Department then called the program director for Nancy and Joyce. The program director testified that the Department was seeking termination of Mother's parental rights to Nancy and Joyce.

After closing the evidence and hearing counsel's argument, the trial court terminated Mother's parental rights on grounds of endangerment and failure to follow the family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E) & (O). The trial court further found that termination of Mother's rights was in the best interest of the children and appointed the Department as sole managing conservator.

In five issues Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings.

## II. ANALYSIS

### A. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

11

Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, No. 17-0477, ___ S.W.3d ___, 2018 WL 5304691, at \*3 (Tex. Oct. 26, 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 2018 WL5304691, at \*4; *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 336. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id*.; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id*.

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 2018 WL5304691, at *4; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B.    Predicate Grounds

In her second issue Mother argues the evidence was legally and factually insufficient to support termination under section 161.001(b)(1)(O) of the Texas Family Code. Only one predicate finding under section 161.001 is necessary to support a judgment of termination when the trial court also finds that termination is in the children's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

To terminate parental rights pursuant to subsection O, the Department must show that (1) the child was removed under chapter 262 of the Texas Family Code for abuse or neglect, (2) the child has been in the managing conservatorship of the Department for at least nine months, and (3) the parent "failed to comply with the provision of a

court order that specifically established the actions necessary for the parent to obtain the return of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(O).

In her brief Mother does not challenge the requirements that the children were removed for abuse or neglect or that the children were in the Department's care for at least nine months. Mother challenges only the third element and contends the evidence showed that Mother completed all tasks required of the service plan except substance abuse counseling. Mother argues that she was unable to complete substance abuse counseling because she had moved to Montgomery County and did not have transportation to the counseling location.

The trial court signed temporary orders requiring Mother to comply with the family service plan to regain custody of her children. The court's order required Mother to submit to random drug and alcohol tests with the understanding that a failure to appear would be considered a positive test result. In addition to requiring substance abuse counseling, the family service plan also instructed that "[Mother] will understand that in order to successfully participate and apply skills learned in treatment, she must become and remain alcohol/drug free." The record reflects that Mother tested positive for alcohol and admitted drinking alcohol while pregnant with another child while this case was pending.

Mother admitted at the time her children came into the Department's care that she used alcohol as a coping mechanism. Mother's three positive alcohol test results were admitted into evidence. Mother continued to abuse alcohol during the time period the plan was in effect and while pregnant, appearing to excuse her alcohol use by explaining she drank red wine. Mother acknowledged that she knew she was not supposed to drink any alcohol at all while the family service plan was effective. In her brief Mother argues that there is no evidence she knew she was pregnant when she tested positive for alcohol. However, Mother was asked about drinking while pregnant

14

during trial and Mother explained that she was drinking red wine. As established by her own testimony, Mother has not complied with the court's order to remain drug and alcohol free. The record also establishes that she missed at least some child visits without notice and, as she acknowledged, failed to complete the substance abuse assessment program.

In her third issue Mother argues the evidence established by a preponderance of the evidence that, in the respects Mother failed to comply with the plan, she was unable to comply and therefore has proven a defense pursuant to section 161.001(d) of the Texas Family Code.

Texas Family Code section 161.001(d) establishes a defense to subsection O. *See* Tex. Fam. Code Ann. § 161.001(d) (West Supp. 2017). That section provides that a trial court may not terminate the parent-child relationship under subsection O if the parent proves by a preponderance of the evidence that: (1) the parent was unable to comply with specific provisions of the court order, and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent. *Id*. In the termination decree, the trial court found that Mother failed to raise a defense based on section 161.001(d) and, had it been raised, Mother did not prove by a preponderance of evidence that she (1) was unable to comply with specific provisions of a court order; and (2) made a good faith effort to comply with the order and the failure to comply with the order was not attributable to her fault.

In asserting she met her burden of proof under section 161.001(d), Mother argues she did not complete substance abuse counseling because she lacked transportation. She has not addressed the other respects in which she failed to comply with the plan. As discussed above, substance abuse counseling was not the only task Mother failed to complete. Mother presents no argument as to why, for example, she was unable to

15

remain alcohol-free during the pendency of this case, as she knew was required.

In finding that Mother did not meet her burden, the trial court could have relied on Mother's admission of alcohol use during the plan's effective period. We conclude that the trial court's finding that Mother did not raise a defense under section 161.001(d) or, if raised, that she failed to prove the defense by a preponderance of the evidence, is supported by legally and factually sufficient evidence. Even if she had proven the defense with respect to the failure to complete substance abuse counseling, Mother has nonetheless not attempted to invoke the defense as to her failure to remain alcohol-free during the case and thus has not challenged all possible grounds supporting the trial court's judgment. *See Fletcher v. Dep't of Family & Protective Services*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (when an appellant does not challenge an independent ground that may support the judgment that appellant seeks to reverse, this court must overrule the challenges that the appellant has chosen to assert).

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights was justified under Family Code section 161.001(b)(1)(O). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(O). Accordingly, we conclude the evidence is legally and factually sufficient to support the 161.001(b)(1)(O) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection O, we need not review the sufficiency of the evidence to support the subsection E finding. *See A.V.*, 113 S.W.3d at 362. We overrule Mother's first through third issues.

16

## C.  Best Interest of the Children

We turn to Mother's legal and factual sufficiency challenges to the trial court's best-interest finding.

The best interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 2018 WL5304691, at \*5. The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with her natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

17

1.      *Desires of the children*

At the time of trial Nancy was fourteen and Joyce was six years old. When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Joyce was removed from Mother's care when she was five years old. Joyce was arguably too young to express her desires. The record reflects that Joyce has bonded favorably with the foster mother, and calls her "mom." Joyce has emotional needs that are magnified by instability; Joyce did not experience stability with Mother.

Nancy, at fourteen, is old enough to express her desires. The record contains no direct evidence of Nancy's desires. However, Nancy's birthday wish was to have dinner with her foster mother, and Nancy bonded well with the foster mother.

2.      *Present and future physical and emotional needs of the children*

Mother argues that, "[a]side from a conclusory statement that the foster mother 'takes very good care of them' evidence relating to this factor was virtually non-existent." Mother has not provided for the children's past or present physical and emotional needs. There was evidence that Joyce has emotional needs related to instability, and that Nancy was sent to school dirty and without hygiene products. The foster mother is meeting the children's needs and is willing to adopt them. The children know they can go to the foster mother with any needs they have and can depend on her to provide for their physical and emotional needs. A fact finder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness to meet the children's needs in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

18

3.    *Present and future physical and emotional danger to the children*

Mother argues that if the Department thought Mother posed a danger to Nancy and Joyce it would have sought to remove the infant living with Mother at the time of trial.

A court may consider whether a parent demonstrated willingness to effect positive environmental and personal changes within a reasonable amount of time to address unsafe issues. *See* Tex. Fam. Code Ann. § 263.307(b)(11) (West 2014). Mother failed to demonstrate such willingness. Although Mother argues she was sober for the six months leading up to trial, the record reflects that she was frequently intoxicated to the degree that she could not care for her children. The record demonstrates that Mother continued to abuse alcohol even with the knowledge that by doing so she was risking termination of her parental rights.

This court and others have found sufficient evidence to support a best-interest finding despite evidence of compliance with a service plan and lifestyle improvements made while a parent's child is being cared for by others. *See In re A.C.B.*, 198 S.W.3d 294, 299-300 (Tex. App.—Amarillo 2006, no pet.) (notwithstanding post-removal improvement and performance of service plan, prior endangering conduct could support termination); *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue"). *See also In re J.O.A.*, 283 S.W.3d at 346 (in evaluation of legal sufficiency of evidence of endangering conduct, noting "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices").

In this case, Mother's past behavior and testimony at trial do not indicate that her rehabilitation "will surely continue." Mother was dishonest with the caseworker

19

and the Child Advocate with regard to her alcohol abuse.

4.  *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the children by the individuals or agency seeking custody*

These factors compare the Department's plans and proposed placement of the children with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother continued to abuse alcohol after the children were removed from her care including while pregnant with another child. Mother contends she has a stable income and home. To her credit, Mother has maintained employment with Neil Production for nine months. However, Mother was not candid with the court with regard to alcohol use.

In contrast, the foster mother is meeting the children's emotional and physical needs, and is willing to adopt them. Both girls have bonded positively with the foster mother and know they can count on her to meet their needs.

5.  *Programs available to assist in promoting the children's best interest*

Mother argues there was no evidence regarding this factor other than a conclusory statement that the foster mother has programs that will assist her in caring for the children.

In determining the best interest of the children in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d at 249. The record reflects that Mother completed most of her service plan requirements other than completion of the substance abuse counseling and in other respects outlined above. As noted by the trial court, substance abuse counseling can be a long-term process not easily completed in a one-year span of time. However,

20

compliance with a family service plan does not necessarily preclude or undermine a best interest finding. *In re M.G.D.*, 108 S.W.3d at 514. "The elements of a safe, stable, and happy childhood cannot all be reduced to a checklist in a service plan." *Id.* We cannot substitute our judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d at 108.

6. *Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions*

Mother generally argues that the evidence in favor of termination was conclusory and unsupported. To the contrary, the caseworker and Child Advocate testified that Mother was frequently intoxicated to a degree that she could not care for herself, much less her children. Five-month-old Chris died tragically while under Mother's supervision and after she consumed several sixteen-ounce cans of beer.

Stability and permanence are paramount in the upbringing of children. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied). Here, the trial court weighed the decision of the children's best interest, balancing Mother's recent reform against the risk of recurrence of her addiction.

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Mother's fourth issue.

## D. Conservatorship

In her fifth issue Mother argues the evidence is legally and factually insufficient to support the appointment of the Department as sole managing conservator. Specifically, Mother argues there was no evidence that appointment of Mother as

managing conservator would significantly impair the children's physical health or emotional development.

We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Texas Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Protective and Regulatory Services, a licensed child-placing agency, or an authorized agency as a managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a) (West 2014). The trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d at 92. Having found the evidence sufficient to support the best-interest finding, we conclude the trial court had sufficient information upon which to exercise its discretion, and did not abuse its discretion in appointing the Department as sole managing conservator of the children. *See In re L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights). We overrule Mother's fifth issue.

22

### III. CONCLUSION

The evidence is legally and factually sufficient to support the predicate termination finding under subsection O.  And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in the children's best interest so that they could promptly achieve permanency through adoption.  *See In re M.G.D.*, 108 S.W.3d at 513–14.

We affirm the decree terminating Mother's parental rights and naming the Department managing conservator.


/s/    Kevin Jewell
       Justice


Panel consists of Justices Donovan, Wise, and Jewell.